IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| JENNIE M. FRETTS, | CV 11-160-M-DWM |
| Plaintiff, | |
| vs. | ORDER |
| GT ADVANCED TECHNOLOGIES CORPORATION, formerly known as GT SOLAR INTERNATIONAL, INC., and MICHAEL CHALLEEN, | |
| Defendants. | |

**INTRODUCTION**

Defendant Challeen, an employee of Defendant GT, struck Plaintiff Fretts in a vehicle while she was walking across Pine Street in Missoula.  On November 8, 2011, Fretts filed a complaint against GT for negligence, under a respondeat superior theory, and emotional distress.  GT removed the case to federal court, and Fretts added Challeen as a defendant in May 2012.  On December 11, 2012, Fretts filed a motion for partial summary judgment asking the Court to determine as a matter of law that GT is liable, pursuant to the doctrine of respondeat superior, for the tortious conduct of its employee, Challeen.  On the following day, December

12, 2012, GT filed a motion for summary judgment as to all claims in the complaint requesting that the Court find as a matter of law that GT is not liable for Fretts's injuries because Challeen was not acting in the course and scope of his employment with GT at the time of the collision.  Because the record reveals material factual disputes, both motions are denied.

## BACKGROUND & FACTS

Jennie Fretts ("Fretts") brings negligence and emotional stress claims against GT Advanced Technologies, Inc. ("GT") and Michael Challeen ("Challeen") for injuries she sustained at roughly 7:37 a.m. on October 22, 2009, when Challeen struck her with a vehicle while she was walking across the street at the corner of Pattee and Pine Streets in Missoula.  Fretts's injuries included a complex skull fracture, left orbital fracture with entrapment and vision loss in her left eye, optic nerve neuropathy, left second rib fracture, ankle fracture requiring open reduction with internal fixation, and a stellate laceration over her left eye. (Plaintiff's Statement of Facts, doc. 34 at 8.)  Fretts bases her claims against GT on a respondeat superior theory.

GT hired Challeen in 2007 as an applications engineer, which requires him to travel often to various customer sites overseas.  GT's only office in Montana is located in Missoula.  Challeen lived in Butte when GT hired him, and he originally

2

planned to relocate to Missoula.  But, he changed his mind and decided to remain in Butte, and GT agreed that Challeen could remain in there and commute when required.  Regardless of where he lives, Challeen's position is located in Missoula, although he does not have a desk space in the Missoula office.  When he is not working overseas, he works either from his home in Butte or from the office in Missoula; he does not work five days a week in Missoula.  GT provides Challeen with a computer, printer, and cell phone to allow him to perform his work from anywhere.  GT utilizes technology that allows its employees to access its main frame computer and video conference for meetings remotely.  Challeen is a salaried employee, expected to work as many hours as necessary to perform his job.  Challeen's supervisor is Mike Brown ("Brown"), and the General Manager of GT's Missoula operation is David Keck ("Keck").

GT expected Challeen to work in the Missoula office one or two days a week as needed when he was not overseas.  (Brown Depo., doc. 54-2 at 12–13; Challeen Depo., doc. 54-1 at 4; Challeen Depo., doc. 36-1 at 3; Keck Depo., doc. 36-5 at 2–3; Brown Depo., doc. 36-4 at 5.)  When he worked in the Missoula office, Challeen met with his supervisor, performed tasks he could not perform remotely, and supported or met with other co-workers.  (*Id.*)  GT attempted to allow Challeen to attend meetings by telephone, but this was ineffective, so Brown

wanted Challeen to work in the Missoula office regularly.  (Brown Depo, doc. 54-2 at 12–13.)  GT admits that Challeen's presence in the Missoula office serves its business purposes, is "pretty critical," and adds value to its operation.  (Brown Depo., doc. 54-2 at 12–13; Keck Depo, doc. 54-3 at 10–11.)   GT maintains this type of out-of-town work schedule with other employees as well.  The days Challeen works in Missoula are not strictly scheduled or documented by GT even though they occur regularly.  (Brown Depo., doc 54-2 at 18; Challeen Depo., doc. 36-1 at 3.)  When Challeen works in the Missoula office, he does so sometimes at the request of GT and sometimes for his own convenience.  (Challeen Depo., doc. 36-1 at 5; GT Discovery Responses, doc. 36-2 at 5, 7; Challeen Discovery Responses, doc. 36-3 at 4.)

At the time of the collision, GT expressed its expectation for employees to work one or two days per week in the Missoula office informally by verbal communication.  But in January 2010 (after, but not related to, the collision), in an effort to provide a more structured work schedule, GT formalized in writing its expectation that employees work in the Missoula office five days during each three-week period they are in the U.S.  (GT Letter, doc. 34 at 10; Brown Depo., doc. 54-2 at 15–18; Challeen Depo., doc. 54-1 at 13; Challeen Depo., doc. 36-1 at 3; Keck Depo., doc. 36-5 at 2–3.)

4

Brown scheduled, via Outlook, a 1:00 meeting in the Missoula office on October 21, 2009, which Brown expected Challeen to attend. (Outlook calendar, doc. 34 at 13; doc. 54-2 at 21–24.) Challeen's Outlook calendar also shows a meeting at 11:00 in the Missoula office on October 21, 2009, and meetings at 9:30, 10:30, and 2:00 in the Missoula office on October 22, 2009. (Doc. 34 at 13–14.) If applications engineers were scheduled for a meeting in the Missoula office, and they were not out of the country or had not very recently arrived back in the country, Brown expected them to be in Missoula for the meeting. (Doc. 54-2 at 23–24.) However, Challeen does not remember whether he attended the meetings on October 21 and 22, and he says that while GT at times requires him to be in the Missoula office, he doesn't believe those days were such a requirement. (Challeen Depo., doc. 36-1 at 4–5.)

GT's workday is informally 8:00 a.m. to 5:00 p.m. When Challeen works in Missoula, he is not obligated to GT other than the hours he is in the office, and GT has no direction over Challeen's time outside his office hours. (Challeen Depo., doc. 36-1 at 13.) GT does not direct Challeen as to when he drives from Butte to Missoula or how he gets there. (*Id.*) He does not need to seek permission from Brown to approve his driving plans. (*Id.*) Challeen did not have to stay in Missoula the night of October 21; he could have driven back to Butte if he had

5

chosen to.  (*Id.*; Challeen Depo., doc. 45-2 at 6.)

GT reimburses employees for overseas travel expenses, including mileage, meals, lodging, laundry, and some entertainment.  (Brown Depo., doc. 54-2 at 3–6; Challeen Depo., doc. 36-1 at 12.)  Employees are reimbursed via an expense report, and Brown approves expenses that, in his judgment, were incurred in furtherance of the employee's work and benefit GT.  (Doc. 54-2 at 3–6.)  If Challeen travels, he must submit an expense report once a month.  (Doc. 36-1 at 9.)  When Challeen works in Missoula, however, GT only reimburses him for lodging as well as meals that are related to work.  (Brown Depo., doc. 36-4 at 5; Challeen Depo., doc. 36-1 at 9, 12.)  Challeen agrees that GT is not obligated to pay for his lodging in Missoula, but he thinks it is nice that they do.  (Challeen Depo., doc. 36-1 at 12; doc. 45-2 at 6.)  Challeen had a deal with GT that it would pay for his hotel rooms in Missoula while he was still considering relocating to Missoula; he later decided to remain in Butte, but GT continued to pay for his rooms.  (*Id.*)  According to Keck, Challeen's Missoula days are not defined as business trips, and if his room is paid for by GT, then it was simply a nice thing for Brown to do for Challeen.  (Keck Depo., doc. 36-5 at 4.)

Challeen drove from Butte to Missoula on October 21, 2009, for work and to fulfill GT's expectation that he work in the Missoula office one or two days that

6

week.  (Challeen Depo., doc. 54-1 at 4.)  Challeen drove his personal vehicle.  GT

did not reimburse Challeen's mileage costs.  (Challeen Depo., doc. 36-1 at 12.)

After working that day, Challeen stayed in the DoubleTree Hotel, where GT

maintains a corporate rating plan.  Challeen made his own arrangements for

lodging, but GT paid for Challeen's room.  (GT Discovery Responses, doc. 36-2 at

8.)  That evening, Challeen had a "project meeting" with Brown over dinner at

Finn & Porter, where they primarily socialized, but discussed some business-

related issues.  (Challeen Depo., doc. 36-1 at 6, 9.)  GT did, nevertheless,

reimburse Challeen for the dinner, and Brown approved Challeen's expense report

for the expense.  (Expense Report & Receipts, doc. 34 at 15–16.)  GT did not

reimburse Challeen for any other expenses on October 21 or 22.

After dinner and unrelated to their work, Challeen and Brown exchanged

their personal vehicles for the night so that Brown could test drive Challeen's new

car.  They agreed to trade back the vehicles the next morning at work, and

Challeen told Brown he would see him in the morning.  On October 22, on his

drive from the hotel to work at GT's office, Challeen was driving Brown's truck

northbound on Pattee Street when he initiated a left turn onto Pine Street and

struck Fretts while she was crossing Pine Street in a southerly direction.  The

Missoula Police Department cited Challeen for failing to yield the right of way to

Fretts.  The collision occurred one-half block from GT's offices at that time.  GT

did not hold any formal discussions about the collision.  (GT Discovery

Responses, doc. 36-2 at 11–12.)  According to Challeen, his workday had not yet

begun at the time of the collision, as he was merely commuting to work.

(Challeen Depo., doc. 36-1 at 11.)

### Summary Conclusion

While most of the less-critical factors for respondeat superior liability point

to employer liability, the parties dispute the two most-critical, material factors:

whether the employer created the need for travel and whether the collision

occurred during the employee's on-duty or travel time hours.  It is reasonable to

find that GT created the need for Challeen's travel, but it is less clear whether

Challeen was on official travel time on the morning of the collision.  Due to the

disputed evidence, the Court cannot as a matter of law reach the question of

respondeat superior liability.  The issue of respondeat superior liability is a

question for the jury.  Consequently the cross motions for summary judgment are

both denied.

### Standard

A party moving for summary judgment bears the burden of demonstrating

"that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may satisfy that burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986). The standard of review is the same for cross-motions as individual motions for summary judgment in that the court must review each motion separately. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal quotation marks omitted).

In evaluating the appropriateness of summary judgment the Court must first determine whether a fact is material; and if so, it must then determine whether

there is a genuine issue for the trier of fact, as determined by the documents submitted to the Court.

As to materiality, the applicable substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.*

If a fact is found to be material, summary judgment will not lie if the dispute about that fact is genuine. In other words, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment should not be granted. *Id.* In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-side that one party must prevail as a matter of law. *Id.* at 251–252.

## ANALYSIS

While determining whether an act was within the scope of employment is generally a question of fact, "it is a question of law for the court when only one legal inference may reasonably be drawn from the facts." *Bowyer v. Loftus*, 194 P.3d 92, 93 (Mont. 2008) (internal citations omitted). A federal court exercising diversity jurisdiction must apply substantive state law. *Am. Triticale, Inc. v. Nytco*

10

*Servs., Inc.*, 664 F.2d 1136, 1141 (9th Cir. 1981).

## I.       **Respondeat superior liability in Montana.**

Respondeat superior imposes liability on an employer for the wrongful acts of an employee that are committed within the scope of his employment.  The employee "must have been acting in the course of his employment, in furtherance of his employer's interest, or for the benefit of his master . . . .  But a servant who acts entirely for his own benefit is generally held to be outside the scope of his employment and the master is relieved of liability."  *Maguire v. State*, 835 P.2d 755, 758 (Mont. 1992) (internal quotation marks and citations omitted).

### A.       **Montana case law presents a myriad of factors used to determine whether an employee was acting in the course and scope of his employment at the time of a collision.**

There are no Montana cases exactly on point with the facts of this case, however, the parties have cited to the most relevant four cases[1] concerning Montana's respondeat superior law as it relates to employee travel.  This case presents distinct factual differences to those cases, but these differences do not create a novel question of law.

---

[1] Fretts also relies on *Restatement (Second) of Agency* § 229, but GT questions whether the Montana Supreme Court has adopted the section.  That section was first cited by the Montana Supreme Court in two cases around 1940, including in *Webster*.  The section has not been used by the Court in any modern cases.  Additionally, the section does not conclusively resolve the dispute here and, if anything, leans toward no respondeat superior liability for GT based on the comments, illustrations, and cases therein.

First, in *Webster v. Mountain States Telephone & Telegraph Co.*, the employee lineman was required to travel frequently throughout Montana working for the telephone company.  89 P.2d 602, 604 (Mont. 1939).  After completing his work in Roundup midday on a Friday, the employer directed him to report for work in Miles City the following Monday.  *Id.*  He drove his personal car, with his family as passengers, and the employer knew of this arrangement.  *Id.*  He paid all the expenses himself of operating the vehicle.  *Id.*  He had his choice of which route he would take and when he would make the drive.  *Id.*  He did not deviate from his regularly traveled route to Miles City.  *Id.*  En route that afternoon, he struck a pedestrian crossing the street in Custer.  *Id.*  Despite the accident, he continued on his drive and arrived in Miles City that evening.  *Id.*  "He was paid his usual wages for the afternoon in question by the defendant company, although he was not required to perform any service for it."  *Id.*

Quoting Justice Cardozo, the Court stated the test in such situations to be:

If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own.  If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk.

*Id.* at 605.  The Court noted that the employee's work required frequent travel, the

12

use of his personal vehicle was impliedly authorized by the employer, and the

employee was acting in obedience to the employer at the time of the accident.  *Id.*

The Court also highlighted that use of a personal vehicle does not preclude

recovery from the employer.  *Id.* at 606.  It held that the trial court properly

submitted to the jury the question of the employer's liability under the doctrine of

respondeat superior.  *Id.*

Second, in *Welch v. Thompson*, the employee construction worker was

required to work at various job sites throughout Bozeman working for the

construction company.  399 P.2d 748, 750 (Mont. 1965).  After completing a job

in the afternoon, the employee's foreman gave him the option to either go home or

finish out the day, and if he chose to finish out the day, to proceed to the other job

site.  *Id.*  The employee drove his personal car, and his foreman knew of this.  *Id.*

The employee followed two other vehicles driven by his co-workers, and did not

deviate from their route.  *Id.*  En route, he collided with a jeep pulling a horse

trailer while attempting to pass another vehicle.  *Id.*  His co-workers expected him

to arrive with them, and when he did not, they went back and found the accident

scene.  *Id.*  Despite the collision, he went on to the job site, worked for two hours,

and he was paid for an entire 8 hour shift that day.  *Id.*

The Court relied on *Webster* and highlighted that the employer directed the

13

employee to the new job site, the employee was paid for the time taken on the drive, the drive was during normal working hours, the drive was for the benefit of the employer, and the foreman knew the employee was driving his own vehicle, knew he was following in the caravan of cars, and expected him to arrive at the job site. *Id.* at 752–753. The Court also found that the employee having the option to report to the new job site did not affect decision because the employee chose to exercise that option to the knowledge of the foreman. *Id.* at 754. The Court ultimately affirmed the trial court's judgment that the employee was, as a matter of law, acting within the course and scope of his employment at the time of the collision, and the court did not need to submit the question to the jury. *Id.*

Third, in *Berretonni v. U.S.*, a member of the United States Air Force was transferred from an Air Force base in Mississippi to a base in South Dakota. 436 F.2d 1372, 1373 (9th Cir. 1970). He was given 30 days delay in reporting to South Dakota, chargeable as leave, and six days travel time, not chargeable as leave. *Id.* He spent his 30 days leave at his home in Oregon, of which the Air Force had knowledge. *Id.* The airman had his choice of routes and travel time. *Id.* After his leave, he was traveling in his personal vehicle from Oregon to South Dakota when the accident occurred near Three Forks, Montana. *Id.*

The Ninth Circuit cited the *Webster* case and went on to highlight the fact

14

that the airman was on official travel status: "No doubt, if the accident had happened between [Mississippi and Oregon] at a time when he was officially on leave, the result might be different, but the leave had expired and he was on official travel time." *Id.* at 1374. The court also stated that although the airman was not on a direct route between Mississippi and South Dakota, he "definitely had not abandoned his employment as an airman at the time of the accident. On the contrary, he was in the process of carrying out that employment by proceeding to [South Dakota] to report, and his deviation from the direct route was with the knowledge and consent of the Air Force." *Id.* The court concluded that there was no personal purpose involved in the airman's travel and affirmed the district court's order denying the government's motion for summary judgment and determining, as a matter of law, that the airman was acting within the course and scope of his employment. *Id.*

Finally, in *Bowyer v. Loftus*, the employee well driller was required to travel frequently throughout the region for the oil drilling company. 194 P.3d 92, 92 (Mont. 2008). The employee finished his shift at a drilling site near Absarokee at 2:30 in the afternoon, and he drove himself and three members of his crew back to their motel rooms in Laurel. *Id.* The employee's job duties included transporting himself and his crew members from the job site to the motel in his personal

vehicle. *Id.* at 93. The employer paid for the hotel rooms. *Id.* After cleaning up from work, he and a crew member drove in the employee's truck to Bridger for dinner and drinks. *Id.* at 92. From there, they continued onto Red Lodge and Absarokee visiting bars before they headed back to the motel in Laurel at 8:30 p.m. *Id.* En route to the motel after their 90-mile round trip, the employee hit another vehicle in a head-on collision. *Id.* The employee was not being compensated for his time or mileage at the time of the collision. *Id.* at 93.

The Court distinguished *Bowyer* from *Webster* in that there the employee "was being paid wages during the time he traveled." *Id.* at 93. The Court highlighted that:

> once [the employee] returned [his crew members] to the motel at the end of the shift, he and the other employees were on their own personal time until they reported for their ride to their next shift. Employees were not required to seek permission from or inform [the employer] if they left the motel. Although [the employer] paid for the motel, it did not provide employees with meal allowances or instruct them on where to eat. [The employer] imposed no curfew or other rules regarding off-duty activities.

*Id.* at 93–94. The Court went on to distinguish *Bowyer* from *Welch* in that the employee there was driving "during normal working hours and while being paid." *Id.* at 94. The Court also distinguished *Bowyer* from *Berrettoni* in that "the driver was on 'official travel status' on his way to a new station assignment at the time of

the accident." *Id.* Finally, in one sentence the Court dismissed five cases the

plaintiffs cited from other jurisdictions, stating they were factually distinguished

from *Bowyer* because there "the drivers/employees involved were on their way to

or from work, from job site to job site, directly to or from dinner, driving their

employer's vehicle, or being paid by the employer for travel." *Id.*

The *Bowyer* Court reiterated that "summary judgment for the employer is

proper if the employee's activity is not related to the employer's business." *Id.*

The Court highlighted that the collision occurred during the employee's off-duty

hours, he was not being paid for his travel, he was not driving to or from work at

the time of the collision, he was on a "90-mile non-work-related jaunt which had

begun with dinner and continued with sightseeing and bar-hopping," and the

travel was neither at the employer's request nor with its knowledge. *Id.* The

Court ultimately affirmed the district court's order granting summary judgment in

favor of the employer. *Id.*

Here, Challeen's drive on October 22, 2009, was similar in some ways to

that of the employees in all of the above cases, and the parties do not dispute these

facts. Challeen is required to travel frequently both overseas and between Butte

and Missoula working for GT. At the time of the collision, Challeen was driving

Brown's personal vehicle, of which GT was aware, and he was not reimbursed for

17

mileage.  He was free to choose his route and the time of his travel.  And similar to *Bowyer*, GT paid for Challeen's hotel room.  Although all of these factors were mentioned by the courts, none of them were determinative of the courts' decisions.

The courts gave more weight to the following factors, of which Challeen's drive is once again similar to in *Webster*, *Welch*, and *Berrottoni*.  GT knew Challeen would be making the drive because it expected him to arrive at the office that morning given his use of the corporate hotel room, his statement that he would see Brown in the morning, his scheduled meetings that day, and his need to exchange vehicles with Brown.  Challeen did not deviate from the direct route from the hotel to the office, and he did not abandon his employment that morning.  His arrival in the office that morning was to the benefit of GT, and his drive that morning was to work and not serve his personal purposes any more than the employees in *Webster*, *Berrettoni*, and *Welch*, who were also reporting to work.

**B.      Ultimately, respondeat superior liability is most appropriate where the employer creates the need for the employee's travel and the collision occurs during the employee's on-duty hours.**

Of all the factors cited in the cases above, the courts most often relied on two critical factors in reaching a decision.  First, the work must create the necessity for the travel; the employer directs the employee to make the trip (or gives him the option), and the employee is in turn obedient to that direction (or

18

exercises the option).  Second, the collision must occur during working hours or

while the employee is on official travel time; payment of hourly wages is not the

key inquiry but instead whether the collision occurs during the employee's on-

duty hours.

> **1.** **The parties dispute whether GT directed Challeen to make the trip, but the only legal inference that can be drawn from the facts is that GT created the need for Challeen's travel.**

GT claims that it merely encouraged Challeen to work from the Missoula

office one or two days a week; that Challeen was merely commuting to the office

like any other employee; that Challeen's position was located in Missoula; and

that on October 22, 2009, it was Challeen's choice whether or not he reported to

work.  Fretts claims that GT expected or required Challeen to work in the

Missoula office one or two days a week; that Challeen was traveling at the time of

the collision; and Challeen was being obedient to GT when he reported for work

that morning.  Fretts also highlights that unlike its other Missoula employees, GT

paid for Challeen's hotel room the night before.

Based on the depositions and discovery responses, the only legal inference

that can be drawn is that GT created the need for Challeen's trip that morning.

The deposition testimony establishes that Challeen was required and expected to

work in the Missoula office one or two days a week.  Unlike a Missoula-area-

based employee, Challeen stayed in the corporate hotel room the night before and he was not merely commuting from home that morning.  Although his position is technically located in Missoula, he does not have a work space and does not spend a majority of his time in the Missoula office.  Although he, like all employees, had the ultimate choice as to whether he would report to work that morning, Challeen exercised to option to report, he drove straight to the office, he had scheduled meetings to attend, he told his boss he would be there, and he needed to go to the office in order to exchange vehicles with Brown.  All of these facts indicate that GT created the need for Challeen's travel that morning.

> **2.   The parties dispute whether the collision occurred during Challeen's on-duty hours, and one clear legal inference cannot be drawn, thus precluding summary judgment.**

GT and Challeen point out that the Missoula office hours are 8:00 a.m. to 5:00 p.m., and Challeen was driving to work at the time of the accident prior to the start of the workday.  Fretts points to Challeen being a salaried employee with no precise working hours, and that at the time of the accident, Challeen was more on travel time than non-travel time.

Although salaried, the GT office had standard workday hours of 8:00 a.m. to 5:00 p.m., and it cannot be disputed that Challeen was driving that morning prior to the start of the workday.  Therefore, the critical inquiry is whether Challeen was

on GT's equivalent to official travel time on the morning of the collision.  When

Challeen traveled overseas, he was without question on official travel time, as all

of his expenses were reimbursed, including mileage, meals, lodging, airfare,

laundry, and entertainment.  But for his trips to Missoula, none of his expenses

were covered by GT except his hotel room and possibly a meal if it was held over

a business meeting.  *Bowyer* illustrates that an employer paying for a motel is not

determinative of respondeat superior liability.  Moreover, GT paying for

Challeen's room appeared to be as a result of an arrangement between GT and

Challeen because Challeen had decided not to immediately relocate to Missoula

and GT offered to pay for his rooms until he did; an arrangement that Challeen

admits should have expired by October 2009 because by that time he had decided

not to relocate.  This indicates that GT paying for the hotel was not a part of its

general travel policies.  Additionally, Keck testified that Challeen was not on

travel time on his trips to Missoula, and any decision to pay for his room would

not have been a travel policy, but instead a decision of Brown to keep up

employee morale.  Moreover, Challeen's position was located in Missoula, and

according to him and GT, it was his choice to reside in Butte.  Thus, looking at all

the facts and circumstances, it appears that Challeen was not on official travel time

at the time of the collision.

This is, however, a very close call.  And, despite the evidence indicating that Challeen was not on travel time, it cannot be ignored that every other factor prior to this travel time inquiry points to employer liability.  Ultimately, Challeen's situation is not as clearly within the course and scope of employment as that in *Welch* and *Berrettoni*.  Likewise, it is not as clearly outside the course and scope of employment as that in *Bowyer*.  For this reason, the facts should be presented to the jury, like in *Webster*.  In light of the disputed evidence, a single legal inference cannot be drawn from the facts, and therefore the Court cannot determine, as a matter of law, that Challeen was working within the course and scope of his employment and that GT is therefore liable under the doctrine of respondeat superior.  Nor can it determine as a matter of law that he was acting outside the scope and course of his employment.

## CONCLUSION

Both motions for summary judgment are DENIED.  The question of respondeat superior liability is for the jury.

Therefore IT IS ORDERED that Plaintiff's motion for summary judgment (doc. 32) is DENIED.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment (doc. 35) is DENIED.

22

The Clerk is directed to notify the parties of the entry of this order.

Dated this 8th day of May, 2013.


DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT

23